UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KEVIN M. TROTMAN,

                      Plaintiff,

- against -

WCBS-AM dba/CBS RADIO-INFINITY
BROADCASTING, INC.,

                      Defendant.

Case No. 06-Civ-3389 (FM)

**RULE 56.1 STATEMENT**

       Pursuant to Local Civil Rule 56.1, defendant CBS Radio Inc. (erroneously sued as "WCBS-AM d/b/a/CBS Radio-Infinity Broadcasting, Inc.") ("CBS Radio" or "Defendant"), sets forth below material facts as to which there is no genuine issue to be tried:

*CBS Radio Hires Trotman as a Retail Sales Executive*

       1.      On or about December 7, 1998, Plaintiff Kevin M. Trotman ("Trotman") was offered a position as a Retail Sales Executive ("RSE") at WCBS-AM NewsRadio 880 (the "Station"). (Declaration of Laura Sack, dated May 18, 2007 ("Sack Decl.), Ex. H).

       2.      Trotman had interviewed for the RSE position with three white supervisors, including Steve Swenson, the Station's Vice President and General Manager. (Pl. Tr. 16-17, 39-40; Swenson Tr. 13).[1]

---

[1] Relevant transcript pages from the depositions of: (i) Kevin M. Trotman, dated March 13, 2007 ("Pl. Tr."); (ii) John Killeen, dated March 15, 2007 ("Killeen Tr."); (iii) Chad Lopez, dated March 21, 2007 ("Lopez Tr."); (iv) Kevin Smith, dated March 29, 2007 ("Smith Tr."); (v) Steve Swenson, dated March 22, 2007 ("Swenson Tr."); and (vi) Scott Tacinelli, dated March 15, 2007 ("Tacinelli Tr."), are respectively attached as Exhibits B through G to the Sack Declaration.

153143.v2

3. Trotman accepted the Station's job offer and began working at the Station as a RSE on or about January 5, 1999. (Pl. Tr. 28).

*Trotman's Duties as a RSE*

4. Broadly stated, Trotman's duties as a RSE were to obtain clients and then to service those clients' accounts. (Pl. Tr. 42).

5. Trotman's "primary focus [was] on gaining new business, acquiring new business." (Pl. Tr. 166).

6. Basically, "[an RSE's] job function is to go out and look for business any way you can." (Killeen Tr. 7).

7. Once a new client decided to advertise on the Station, Trotman was responsible for servicing the account, which included ensuring that the client's advertisements were aired on the Station, making sure the client was billed properly, and making sure the client's needs were met. (Pl. Tr. 41).

8. It was important for Trotman to be very responsive to clients when concerns or problems arose, and to "stay in contact with the clients" even when there were no problems. (Pl. Tr. 62).

9. Trotman explained, "I tried to extend the relationship with the client and the radio station as being the conduit between the two." (Pl. Tr. 62).

10. It was "absolutely" important for Trotman to respond to clients regarding billing questions as soon as the information became available. (Pl. Tr. 64-65).

11. Trotman testified that, "[t]he sooner you get back to the client the sooner they can act upon whatever needs to be done and it shows your attentiveness in terms of how [the client feels they are] being treated." (Pl. Tr. 64-65).

12. Trotman described responsiveness as "critical" because "if a [client] can't get back in touch with you, you become just like anyone else trying to get their business. It differentiates you from all the other people trying to get their business." (Pl. Tr. 75).

*Trotman's Absenteeism and Inaccessibility to His Colleagues and Clients*

13. Each RSE was expected to be in the office at some point every day, unless he had sales calls which prevented him from appearing in the office. (Pl. Tr. 66).

14. Only "occasionally" did sales calls preclude Trotman from reporting to the office at some point during the workday. (Pl. Tr. 66-67).

15. Trotman was often - and inexplicably - absent from the office for days on end. (Tacinelli Tr. 27; Killeen Tr. 28-30; Swenson Tr. 26-27).

16. Trotman knew that he was expected to notify the Station if he was going to be absent. (Pl. Tr. 70).

17. On numerous occasions in 2003, however, Trotman was absent without notice. (Sack Decl., Exs. I & J).

18. Barbara Pearson (who was then the Retail Sales Manager and Trotman's supervisor) was unable to reach him and heard nothing from him for several consecutive days. (Sack Decl., Exs. I & J; Pl. Tr. 262).

153143.v2

-3-

19.     On these occasions, Pearson gave Trotman verbal warnings, expressing her concern about his unexcused absences and his failure to notify her that he would be absent. (Pl. Tr. 262-63).

*Trotman's Formal Written Warning Regarding Absenteeism
and Non-Responsiveness to Client Concerns*

20.     On Monday, October 20, 2003, Trotman left Pearson a voicemail message stating that he would not arrive at work until around 10:00 a.m. because his wife was out of town and he had to take his daughter to school. (Sack Decl., Ex. I; Pl. Tr. 262-63).

21.     A problem arose that morning with one of Trotman's accounts, the Bergen County Democratic Organization. (Sack Decl., Ex. I; Pl. Tr. 264).

22.     Because Trotman had still not arrived at work by 11:00 a.m., Pearson attempted (unsuccessfully) to reach him on his cell phone and left an urgent voicemail message for him. (Sack Decl., Ex. I; Pl. Tr. 264).

23.     Trotman did not respond. (Sack Decl., Ex. I; Pl. Tr. 264-65).

24.     Pearson then tried (unsuccessfully) to reach Trotman at home, and she left a message on his home answering machine. (Sack Decl., Ex. I; Pl. Tr. 265).

25.     Trotman did not respond. (Sack Decl., Ex. I; Pl. Tr. 265).

26.     At 3:00 p.m., when Trotman still had neither called Pearson nor reported to work, Pearson tried yet again to reach him on his cell phone. (Sack Decl., Ex. I).

27. Trotman still did not respond, nor did he ever report to work that day. (Sack Decl., Ex. I; Pl. Tr. 262).

28. Pearson never heard from Trotman that day in response to her three urgent messages. (Sack Decl., Ex. I; Pl. Tr. 264-65).

29. When Pearson asked Trotman the next day about his mysterious disappearance, he claimed he was tired from driving home from Virginia and had slept through the repeated ringing of his mobile and home phones. (Sack Decl., Ex. I; Pl. Tr. 264-65).

30. Pearson issued a formal written warning to Trotman concerning this incident. (Sack Decl., Ex. I; Pl. Tr. 261-62).

31. In that written warning, Pearson noted, "this is not the first time that this has happened. There have been other instances where I was not able to reach you or did not hear from you for a number of days. You were given verbal warnings on those other occasions." (Sack Decl., Ex. I).

32. Pearson reminded Trotman in this written warning that "each Account Executive is required to be in touch with his or her manager during business hours [and if personal issues arise] you should contact me, another manager, or your assistant so that we know what is happening and can cover your accounts accordingly." (Sack Decl., Ex. I).

*Trotman's Final Written Warning Regarding*
*Absenteeism and Non-Responsiveness to Client Concerns*

33. Trotman was continuously absent from work again two months later, from Friday, December 19 through Monday, December 29, 2003. (Sack Decl., Ex. J; Pl. Tr. 267).

153143.v2

-5-

34. Trotman did not contact the Station to report this unscheduled absence, nor did he call in to the Station at any time during this period to report on his whereabouts or his plans to return to work, nor did he respond to any of Pearson's numerous messages. (Sack Decl., Ex. J; Pl. Tr. 267).

35. During Trotman's December 2003 absence, a problem arose with another of his clients, ElderPlan. (Sack Decl., Ex. J; Pl. Tr. 266-67).

36. ElderPlan wanted to advertise during the week of December 29, but could not get in contact with Trotman. (Sack Decl., Ex. J; Pl. Tr. 266-67).

37. On Monday, December 29, Trotman finally left a voicemail for Pearson stating that he had been absent because of a "medical emergency" and that he would return to work on Tuesday, December 30. (Sack Decl., Ex. J).

38. Rather than firing Trotman for his extended unexcused absence (and concomitant failure to communicate) in December 2003, Station management elected to "give him an opportunity to turn it around" because he was a long-term employee who had previously shown that he could perform. (Swenson Tr. 30).

39. On December 29, 2003, Pearson gave Trotman a final written warning, referencing numerous past instances in which she was unable to reach Trotman and did not hear from him for several days. (Sack Decl., Ex. J; Pl. Tr. 266).

40. Pearson warned Trotman in this final written warning that if he did not come to work or called in late with an unverified excuse, his employment with CBS Radio would be terminated "immediately." (Sack Decl., Ex. J).

153143.v2

*Chad Lopez Becomes Retail Sales Manager*

41. In March 2004, Chad Lopez (who had been an account executive) replaced Pearson as the Station's Retail Sales Manager ("RSM") and became Trotman's supervisor. (Lopez Tr. 8-9, 29).

42. Lopez is 75% Hispanic and 25% African-American. (Lopez Tr. 4-5).

43. Lopez and Trotman had a good relationship. (Pl. Tr. 242-43; Lopez Tr. 91).

44. In the Summer of 2004, Lopez and his family attended a barbecue at Trotman's house. (Pl. Tr. 243; Lopez Tr. 15).

45. Trotman listed Lopez as a reference in a job application in December 2005. (Sack Decl., Ex. K).

46. Before Lopez assumed the role of RSM, Pearson told Lopez that "there [were] problems with [Trotman] showing up to work." (Lopez Tr. 29).

47. Pearson showed Lopez the written warnings and informed him that she had spoken with Trotman about his attendance problems. (Lopez Tr. 29).

48. After becoming RSM, Lopez spoke with Trotman about his attendance problems. (Lopez Tr. 34).

49. Lopez testified:

> [w]hen I took over as [RSM], I had mentioned to Kevin, 'Look, I know you have a problem. They have made me aware of your record. You have a problem with showing up. I am here to work with you. I will pick you up from your house. I will do whatever

153143.v2

>   we need to do. Let's do it together and let's get you into the office just so you are here so I know what you are doing. Then you can go out on your calls and I will know where you are for the day.'

(Lopez Tr. 34).

50. Lopez's efforts to help Trotman also included going out on sales calls with him because "Trotman was not performing as well as the other sales people." (Lopez Tr. 22).

51. When he was promoted to Local Sales Manager ("LSM") in late 2004/early 2005, Lopez became responsible for assigning Orphaned Accounts (accounts left behind by former salespeople). (Lopez Tr. 7, 44-45).

52. Lopez made these assignments based on the RSE's prior sales performance, reliability, trustworthiness and dependability. (Lopez Tr. 7, 74-75, 79-80).

53. A portion of Lopez's compensation as RSM and LSM was based on the sales performance of the RSEs. (Pl. Tr. 291; Lopez Tr. 54).

54. It was in Lopez's personal financial interest to assign Orphaned Accounts to those RSEs whom he believed would maximize the sales opportunities with respect to those accounts. (Pl. Tr. 291; Lopez Tr. 54).

55. Lopez viewed Trotman as one of the top sales people in terms of knowledge of the product. (Lopez Tr. 81).

56. Lopez found that Trotman was weak in the areas of reliability and servicing accounts. (Lopez Tr. 81).

153143.v2

57. In Lopez's opinion, Trotman had a "sales problem" because he did not show up for work, which affected his sales numbers. (Lopez Tr. 32).

58. Clients complained that Trotman was inattentive. (Pl. Tr. 147-151, 222; Lopez Tr. 39-41).

59. Trotman admits that clients complained about him. (Pl. Tr. 147-151, 222).

60. Lopez testified that Weiden & Kennedy (which Lopez considers a "big account") "complained that [Trotman] had messed up all their [advertising] schedules. They had left messages. His mail box was filled. They couldn't leave any more messages. There [were] a ton of things that [were not] followed up on." (Lopez Tr. 39-40).

61. Princeton Longevity, another "big account," complained about Trotman's inaccessibility. (Lopez Tr. 41-42).

62. Other, smaller accounts complained about Trotman as well. (Lopez Tr. 41-42).

*Station Management Reassigns a Lucrative Account to Trotman*

63. Trotman believes he lost more accounts in 2004 than at any other time during his tenure at the Station, and he attributes his loss of accounts that year to "a combination of factors" -- "competing media, an agency is looking for new direct clients, slower acquisition time for new accounts. I think that pretty much covers it." (Pl. Tr. 163-164).

64. Trotman does not attribute his loss of accounts in 2004 or the attendant loss of commissions to race discrimination. (Pl. Tr. 163-164).

65. Cathy Murphy became the RSM and Trotman's immediate supervisor in late September 2004. (Declaration of Catherine L. Murphy, dated May 17, 2007 ("Murphy Decl."), at ¶ 3).

66. In October 2004, Lopez and Murphy went out to lunch with Trotman. (Sack Decl., Ex. L at ¶ 5).

67. Trotman voiced concern during lunch that he had fewer accounts than other RSEs. (Lopez Tr. 94; Sack Decl., Ex. L at ¶ 5; Sack Decl., Ex. M at 3).

68. This was the first time Trotman complained that he did not have enough accounts. (Lopez Tr. 96; Sack Decl., Ex. L at ¶ 5; Sack Decl., Ex. M at 3-4).

69. In response, Lopez and Murphy asked Trotman what he wanted. (Sack Decl., Ex. M at 4).

70. Trotman asked (for the first time) to be given retail accounts, and, therefore, Lopez and Murphy reassigned the Princeton Longevity retail account to him. (Lopez Tr. 94-96; Sack Decl., Ex. M at 3-4).

71. Princeton Longevity placed more than one hundred thousand dollars ($100,000) per year in advertising on the Station. (Lopez Tr. 95-96).

72. Trotman considered the Princeton Longevity account to be "lucrative." (Sack Decl., Ex. M at 3).

*Trotman Abandons His Job*

73. In January or February 2005, Murphy told Trotman that he needed to improve his sales performance. (Pl. Tr. 231).

74. Trotman interpreted Murphy's instruction to mean that he would be fired if he did not perform better. (Pl. Tr. 231-33).

75. RSE Scott Tacinelli was similarly spoken to by Station management at one point in 2001 about his "lack of performance." (Tacinelli Tr. 33-34).

76. On Thursday, March 31, 2005, Murphy apprised Trotman that his client, Princeton Longevity, had reported that he "didn't get back to them soon enough." (Pl. Tr. 222-25).

77. Princeton Longevity needed to reach Trotman because "there was a problem with their schedule;" specifically, Trotman had written up the advertising schedule with incorrect dates. (Pl. Tr. 253-54).

78. Murphy spoke with Trotman about Princeton Longevity's concerns for 5-10 minutes by telephone (after Trotman left the office for the day at 3:30 p.m.), and she asked him to come into the office to meet with her at 8:30 a.m. the following day, April 1. (Pl. Tr. 239-255; Murphy Decl., Ex. A).

79. Trotman did not show up to work for this meeting on April 1, nor did he advise Murphy that he would not be there. (Pl. Tr. 239).

153143.v2

80. Trotman did not contact Murphy because he had already decided (without informing the Station) not to return to work at the Station. (Pl. Tr. 239, 255).

81. Trotman never showed up for work at the Station again. (Pl. Tr. 239-241).

82. Beginning on April 1, 2003, Murphy tried (unsuccessfully) to locate Trotman because "clients were calling into the station and wondering what [was] going on with [him]" and he was not returning their voicemails or emails. (Murphy Decl., Ex. A).

83. Murphy called Trotman's cell and home phones and left messages for him every day from April 1 through April 6. (Murphy Decl., Exs. A and B; Pl. Tr. 245).

84. Trotman deliberately ignored each one of the messages that Murphy left for him, although he saw on his caller ID that Murphy was calling, and although he knew she might be calling him about clients who needed his help. (Pl. Tr. 245, 258-59).

85. Trotman refused to even check his work voicemail. (Pl. Tr. 246).

86. After not seeing or hearing from Trotman for more than a week, CBS Radio terminated his employment for job abandonment on April 8, 2005. (Sack Decl., Ex. N; Pl. Tr. 105).

87. The possibility of terminating Trotman was discussed by Station management only "when [Trotman] had not shown up for work for probably a period of a week, and then they had called the local police in his town to go see if he was at home, and when we learned that he was at home and just did not come to work." (Swenson Tr. 57).

88. Trotman is not challenging his discharge in this action. (Pl. Tr. 126; see also Complaint and Sack Decl. Exs. L & M).

*Trotman's Compensation*

89. RSEs' compensation is based solely on the amount of advertising that their clients purchase, not on the number of accounts they service. (Pl. Tr. 335).

90. RSEs at the Station typically service two types of accounts: retail (also know as "direct") and agency accounts. (Pl. Tr. 38).

91. A retail account means that the RSE deals directly with the business advertising on the Station. (Pl. Tr. 38).

92. On an agency account, the RSE deals with an advertising agency and not necessarily with the advertiser. (Pl. Tr. 38).

93. During Trotman's tenure at the Station, RSEs earned either 17% or 15% on all direct business, depending on whether they met their individual monthly budget. (Pl. Tr. 183-84; Sack Decl., Ex. O).

94. If RSEs sold agency accounts, they would earn either 5% or 4% on all agency business, depending on whether they met their individual monthly budget. (Pl. Tr. 183-84; Sack Decl., Ex. O).

95. RSEs' individual compensation varied based on their performance: "[s]ales … is based [on] what you close, what you bring in, what you put into the job…." (Lopez Tr. 22).

96. From 2001 through 2004, Trotman's total compensation was consistently near ninety thousand dollars ($90,000), peaking at one hundred thousand dollars ($100,000) in 2003. (Sack Decl., Exs. P – S).

97. In 2001, Trotman earned approximately eighty-seven thousand dollars ($87,000). (Sack Decl., Ex. P; Pl. Tr. 157).

98. In 2001, RSE Scott Tacinelli earned approximately fifty thousand dollars ($50,000). (Sack Decl., Ex. P; Tacinelli Tr. 9).

99. Tacinelli started as a RSE in November 2000. (Tacinelli Tr. 6).

100. In 2002, Trotman earned approximately eighty-seven thousand dollars ($87,000). (Sack Decl., Ex. Q; Pl. Tr. 157).

101. In 2002, Tacinelli earned approximately sixty-eight thousand dollars ($68,000). (Sack Decl., Ex. Q; Tacinelli Tr. 9).

102. In 2002, RSE John Killeen earned approximately thirty-five thousand dollars ($35,000). (Sack Decl., Ex. Q).

103. Killeen started as a RSE in April 2002. (Sack Decl., Ex. Q; Killeen Tr. 6).

104. In 2003, Trotman earned approximately one hundred thousand dollars ($100,000). (Sack Decl., Ex. R; Pl. Tr. 157).

105. In 2003, Tacinelli earned approximately one hundred eleven thousand dollars ($111,000). (Sack Decl., Ex. R).

153143.v2

-14-

106. In 2003, Killeen earned approximately eighty-seven thousand dollars ($87,000). (Sack Decl., Ex. R; Killeen Tr. 6).

107. In 2004, Trotman earned approximately eighty-nine thousand dollars ($89,000). (Sack Decl., Ex. S; Pl. Tr. 157).

108. In 2004, Tacinelli earned approximately one hundred forty thousand dollars ($140,000). (Sack Decl., Ex. S).

109. In 2004, Killeen earned approximately one hundred fifteen thousand dollars ($115,000). (Sack Decl., Ex. S).

*Accounts Assigned to Trotman by the Station*

110. Trotman asked Station management to assign only one Orphaned Account to him (in 1999); that account, "Radiology," was assigned to him as he requested. (Pl. Tr. 195-96).

111. By contrast, Tacinelli asked multiple times to have specific accounts assigned to him, and not all of his requests were granted. (Tacinelli Tr. 17).

112. By Trotman's own admission, at least five other accounts were assigned or reassigned to him during his tenure with the Station, including Princeton Longevity, Crème Cremaillere, Veuve Cliquot, Ad Lab, and an account assigned to Trotman in 2001 whose name he does not recall. (Pl. Tr. 190, 193; Lopez Tr. 94-95).

113. To Trotman's knowledge, Swenson never vetoed the assignment of any account to him. (Pl. Tr. 294).

114. Station management assigned to Kevin Smith (another black RSE) "about half, five" of Smith's active accounts in 2006. (Smith Tr. 28-29).

115. Bill McGee, another black account executive, was assigned the Station's largest agency account (JL Media), as well as another large account (Furman Roth). (Pl. Tr. 366; Lopez Tr. 126).

116. When McGee left the Station, he gave Trotman contact information for several of his former clients. (Pl. Tr. 205).

*Trotman Never Complained About Race Discrimination*

117. CBS Radio's Fair Employment Practices Policy prohibits race discrimination in employment, and provides a mechanism for employees to raise concerns about possible violations of this prohibition against discrimination:

> If a situation develops which an employee feels should be investigated, he/she should first contact his/her immediate supervisor or manager. If the employee does not feel comfortable discussing the complaint with his/her supervisor, or if circumstances prohibit this course of action, he/she should contact his/her General Manager or the Corporate Human Resources Department. No employee who exercises his/her right under this policy will be subject to any adverse employment actions.

(Sack Decl., Ex. T; Pl. Tr. 297-99).

118. Prior to his termination, Trotman never told Swenson, Lopez, Murphy, or anyone else in management (or Human Resources) that he believed he was the victim of race discrimination. (Pl. Tr. 295-97).

119. Trotman never told <u>anyone</u> at the Station or at CBS Radio that he believed he was the victim of race discrimination. (Pl. Tr. 302).

120. Neither Lopez nor Swenson ever said anything to Trotman to suggest that they had a bias against black people, and Trotman never heard from anyone else that Lopez or Swenson had ever made comments suggesting any such bias. (Pl. Tr. 287-89).

*Killeen and Tacinelli Are Not Similarly Situated to Trotman*

121. Neither Killeen nor Tacinelli ever received disciplinary warnings for repeated unexcused absences or for non-responsiveness to clients. (Pl. Tr. 286-87; Killeen Tr. 24; Tacinelli Tr. 33-34).

122. Trotman admits that he is unaware of any instances in which either Killeen or Tacinelli went AWOL. (Pl. Tr. 286-287).

123. Killeen acquired new retail accounts through "lots of cold calling." (Killeen Tr. 7-8).

124. Killeen brought in more accounts each year because he cold called. (Killeen Tr. 14).

125. Another black RSE, Kevin Smith, also cold calls to bring in new accounts, as do other RSEs. (Smith Tr. 11-12, 24).

126. Trotman abandoned a subsequent sales job after he abandoned his job with CBS Radio because he doesn't like cold calling. (Pl. Tr. 325-26).

127. After Trotman left the Station and Killeen was assigned Valley National Bank (which had been Trotman's account), the revenues generated by that account grew exponentially. (Killeen Tr. 12).

128. Tacinelli has increased his sales each year of his career as a RSE. (Tacinelli Tr. 9).

Dated: New York, New York
       May 18, 2007

                        KAUFF McCLAIN & McGUIRE LLP

                        By: *Laura Sack*
                            Laura Sack (LS 5501)
                            Roy P. Salins (RS 0793)
              950 Third Avenue, 14th Floor
              New York, New York 10022
              (212) 644-1010
              Attorneys for Defendant

153143.v2