UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

KEVIN M. TROTMAN,                              :

                            Plaintiff,        :        **MEMORANDUM DECISION AND ORDER**

            -against-                       :

                                                    06 Civ. 3389 (FM)

CBS RADIO INC.,                                :

                    Defendant.        :

--------------------------------------------------------x

+-----------------------------------------+
| USDC SDNY                               |
| DOCUMENT                                |
| ELECTRONICALLY FILED                    |
| DOC #: _____                 |
| DATE FILED: _____                |
+-----------------------------------------+

**FRANK MAAS**, United States Magistrate Judge.

I.    <u>Introduction</u>

        Plaintiff Kevin M. Trotman ("Trotman") is an African-American male.  In this employment discrimination action, under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, <u>et</u> <u>seq.</u>, Trotman alleges that his former employer, CBS Radio Inc. ("CBS Radio"), subjected him to "economic discrimination" on the basis of his race.  Specifically, Trotman contends that CBS Radio improperly assigned sales accounts to white employees who had less sales experience and seniority than he did.  The parties have consented to my exercise of jurisdiction over this case for all purposes pursuant to 28 U.S.C. § 636(c).  (Docket No. 12).  Presently before the Court is CBS Radio's motion for summary judgment.  (Docket No. 28).  For the reasons set forth below, that motion is granted, and Trotman's complaint is dismissed with prejudice.

II.    Background

    A.    Relevant Facts

       Unless otherwise noted, the relevant facts are set forth in the light most favorable to Trotman.

       1.    Trotman's Employment as an
          Account Executive at CBS Radio

       Trotman is an African-American male who began working in sales in 1983. (Pl.'s R. 56.1 Counter Stmt. at 6 n.1; Decl. of Rick Ostrove, Esq., dated June 8, 2007 ("Ostrove Decl."), Ex. 3 (Aff. of Kevin M. Trotman, sworn to on June 8, 2007 ("Trotman Aff."), ¶ 2)).[1]  In 1999, CBS Radio hired Trotman as an Account Executive ("AE"). (Def.'s R. 56.1 Stmt. ¶ 3; Dep. of Kevin M. Trotman, taken on Mar. 13, 2007 ("Trotman Dep."), at 28.  Prior to being hired, Trotman interviewed with three white CBS Radio executives.  (Def.'s R. 56.1 Stmt. ¶ 2; Trotman Dep. at 16-17).

       An AE's job at CBS Radio is to sell advertising and service client accounts. (See Def.'s R. 56.1 Stmt. ¶ 4; Trotman Dep. at 42).  In servicing an account, an AE must attend to the client's needs, ensure that its advertisements are correctly aired, answer questions, handle copy, and establish that the billing is proper.  (Def.'s

---

      [1]    In its reply papers, CBS Radio complains that Trotman's Rule 56.1 Counter Statement contains numerous factual averments which are not supported by the evidentiary citations, if any, supplied by Trotman.  (See Def.'s Reply at 1; Reply Decl. of Laura Sack, Esq., dated June 21, 2007, ¶¶ 1-17).  When Trotman has made statements that are not supported by the record, I have disregarded them.

R. 56.1 Stmt. ¶ 7; Trotman Dep. at 41-42).  Trotman does not dispute that AEs had to stay

in contact with their clients even if there were no problems.  (Def.'s R. 56.1 Stmt. ¶ 8;

Trotman Dep. at 62).

a.    <u>Trotman's Customer Service</u>

The parties disagree as to how well Trotman serviced his clients.  Chad

Lopez ("Lopez"), one of Trotman's supervisors, testified that Trotman's "weaknesses"

included such areas as reliability and the "servicing [of] accounts."  (Def.'s R. 56.1 Stmt.

¶ 56; Dep. of Chad Lopez, taken on Mar. 21, 2007 ("Lopez Dep."), at 81).  On the other

hand, Jean Genovese, a representative of the New York State Department of Labor, has

stated that Trotman "was consistently responsive to [her] calls and inquiries," and that

"[s]ervices were provided by [Trotman] in a timely manner and met the requirements of

the contract."  (Ostrove Decl. Ex. 7 (Aff. of Jean Genovese, sworn to on June 5, 2007,

¶ 3)).  Similarly, David Kufeld, who arranged advertising for Weitz & Luxemberg, P.C.,

reported that Trotman serviced his account "without any problems," and was "always

knowledgeable and professional" and "extremely prompt in responding."  Kufeld also

noted that when Trotman was servicing the Weitz & Luxemberg account, "things always

ran smoothly."  (Ostrove Decl. Ex. 8 (Aff. of David Kufeld, sworn to on May 29, 2007,

¶¶ 3-5, 7)).

Despite the kudos from certain clients, Trotman acknowledges that other

clients occasionally raised concerns about his service.  (Def.'s R. 56.1 Stmt. ¶ 59).

3

Trotman characterizes many of these concerns as "perceived issues" which were actually "much [a]do about nothing." (Trotman Dep. at 147). For example, he notes that an advertising agency once complained that its commercial did not air, even though it had. (Id. at 148). On another occasion, Atlantis Health Plan, one of Trotman's accounts, complained to Trotman's supervisor inaccurately that Trotman had not given it the best possible rate. (Id. at 149-50). According to Trotman, such complaints were frequently "used as a bargaining tool. So maybe you could classify it as a complaint, but in actuality it is not a complaint." (Id. at 150).

           b.      <u>Trotman's Absenteeism and Eventual Termination</u>

Each AE was expected to be at the CBS Radio offices for some portion of each work day, unless sales calls made that impractical. (Def.'s R. 56.1 Stmt. ¶ 13; Trotman Dep. at 66). An AE who was unable to come to the office because of sales calls was expected to notify CBS Radio that he or she would be absent. (See Def.'s R. 56.1 Stmt. ¶¶ 14, 16; Trotman Dep. at 66-67, 70). Despite this reporting requirement, CBS Radio contends that "Trotman was often – and inexplicably – absent from the office for days on end." (Def.'s R. 56.1 Stmt. ¶15; see Dep. of Steven M. Swenson, taken on Mar. 21, 2007 ("Swenson Dep."), at 26-27; Dep. of Scott Tacinelli, taken on Mar. 15, 2007 ("Tacinelli Dep."), at 27). For his part, Trotman alleges that most of the days he failed to report to work were attributable to medical problems. (Pl.'s R. 56.1 Counter Stmt. ¶ 15; Trotman Dep. at 71).

On October 23, 2003, Trotman left a voicemail message for his supervisor, Barbara Pearson ("Pearson"), stating that he would not be at work until approximately 10 a.m. because he needed to take his daughter to school.  (Def.'s R. 56.1 Stmt. ¶ 20; Decl. of Laura Sack, Esq., dated May 18, 2007 ("Sack Decl."), Ex. I).  Later that day, a problem arose concerning one of Trotman's accounts, the Bergen County Democratic Organization.  (Def.'s R. 56.1 Stmt. ¶ 21; Sack Decl. Ex. I).  Pearson attempted to reach Trotman several times by telephone and left messages, but he did not answer or come to the office that day.  (Def.'s R. 56.1 Stmt. ¶¶ 22-27; Sack Decl. Ex. I).  The next day, Trotman confessed to Pearson that he was tired after driving home from Virginia and had slept through Pearson's repeated calls.  (Def.'s R. 56.1 Stmt. ¶ 29; Sack Decl. Ex. I).

On October 27, 2003, Pearson sent Trotman a "formal warning" which cautioned:  "[T]his is not the first time this has happened.  There have been other instances where I was not able to reach you or did not hear from you for a number of days.  You were given verbal warnings on those occasions."  (Sack Decl. Ex. I; Def.'s R. 56.1 Stmt. ¶ 31).[2]

Despite Pearson's warning, Trotman did not report to work from December 19 through 29, 2003.  (Def.'s R. 56.1 Stmt. ¶ 33; Sack Decl. Ex. J).  During this eleven-

---

[2]     In his Rule 56.1 Counter Statement, Trotman contends that he submitted medical documentation to CBS Radio excusing the absences that led to Pearson's October 2003 memorandum.  (Pl.'s R. 56.1 Counter Stmt. ¶ 17) (citing Trotman Dep. at 271).  However, the deposition transcript page to which he cites apparently refers solely to an eleven-day absence which occurred in December 2003, <u>after</u> Pearson sent her memo.

day period, a problem arose with another of Trotman's clients, Elder Plan, which had

wanted to advertise that week, but could not get in contact with Trotman.[3]  (Def.'s R. 56.1

Stmt. ¶¶ 35-36; Sack Decl. Ex. J).  Although Pearson left numerous telephone messages

on Trotman's home answering machine and cellular telephone, he did not return her calls

until December 29, 2003, when he left her a voicemail message indicating that he had

missed work because of a medical emergency and would return to work the next day.[4]

(Def.'s R. 56.1 Stmt. ¶¶ 34, 37; Sack Decl. Ex. J).  After receiving Trotman's voicemail

message, Pearson sent Trotman a "final formal warning regarding [his] absenteeism,"

which stated:

> Kevin, unfortunately, this is not the first time that this has
> happened.  There have been numerous instances where I
> could not reach you or did not hear from you for a number of
> days.  In the past you have been given a verbal warning (i.e.,
> June 11th, 2003) and on October 27th, you were given a
> formal written warning.
>
> This letter serves as a <u>final warning</u>.  If you do not show up to
> work or call in late with a legitimate excuse that cannot be

---

[3]       Trotman contends that "Elder Plan already had a 'pre-booked' schedule that
negated the need for any last minute advertising," but does not dispute that Elder Plan was unable
to contact him.  (See Pl.'s R. 56.1 Counter Stmt. ¶¶ 35-36; Trotman Aff. ¶ 7).

[4]       Trotman alleges that his absence during this period was "necessary" and
"supported by medical documentation which [he] submitted to [CBS Radio] upon returning to
work."  (Pl.'s R. 56.1 Counter Stmt. ¶ 34) (citing Trotman Dep. at 271).  His deposition
testimony regarding that documentation is considerably more equivocal.  (See Trotman Dep. at
271).  In any event, Trotman does not dispute that he failed to contact CBS Radio for an
extended period despite Pearson's concerted efforts to get in touch with him.  (See Def.'s R. 56.1
Stmt. ¶ 34; Pl.'s R. 56.1 Counter Stmt. ¶¶ 18, 20-31).  At his deposition, Trotman also was
unable to recall the name of the medical emergency that allegedly required him to miss more than
a week of work.  (See Trotman Dep. at 268-69).

> verified, your employment with [CBS Radio] will be
> terminated <u>immediately</u>.

(Sack Decl. Ex. J; Def.'s R. 56.1 Stmt. ¶ 39) (emphasis added).

In or around March 2004, Lopez replaced Pearson as Trotman's supervisor. (Def.'s R. 56.1 Stmt. ¶ 41; Lopez Dep. at 8-9, 29).  Lopez is part Hispanic and part African-American.  (Def.'s R. 56.1 Stmt. ¶ 42; Lopez Dep. at 4-5).  He was a "huge supporter" of Trotman, whom he considered a friend.  (Lopez Dep. at 91; Def.'s R. 56.1 Stmt. ¶ 43).

Pearson discussed Trotman's chronic absenteeism with Lopez even before he assumed her position.  (Def.'s R. 56.1 Stmt. ¶ 46; Lopez Dep. at 29).  She also showed Lopez the formal warnings issued to Trotman and stated that she had spoken with Trotman about the issue.  (Def.'s R. 56.1 Stmt. ¶ 47; Lopez Dep. at 29).  Accordingly, when Lopez became Trotman's supervisor, he told Trotman:

> Look, I know you have a problem.  They have made me aware
> of your record.  You have a problem with showing up.  I am
> here to work with you.  I will pick you up from your house.  I
> will do whatever we need to do.  Let's do it together and let's
> get you into the office just so you are here so I know what you
> are doing.  Then you can go out on your calls and I will know
> where you are for the day.

(Lopez Dep. at 34; Def.'s R. 56.1 Stmt. ¶ 49).

In 2004, while reporting to Lopez, Trotman apparently did not have any problems at CBS Radio regarding his attendance.  Indeed, Trotman was the second most productive member of Lopez's sales team in that year.  (Lopez Dep. at 151).

In late 2004, Lopez was promoted to Local Sales Manager, in which capacity he was responsible for the reassignment of "Orphaned Accounts" that AEs left behind when they terminated their employment at CBS Radio.  (Def.'s R. 56.1 Stmt. ¶ 51; Lopez Dep. at 7, 74-75).  Lopez assigned these accounts to AEs on the basis of their prior sales performance, reliability, trustworthiness, and dependability.  (Def.'s R. 56.1 Stmt. ¶ 52; Lopez Dep. at 75, 78-80).  Because a portion of Lopez's compensation as the Local Sales Manager depended upon the sales performance of the AEs he supervised, it was in his financial interest to assign the Orphaned Accounts to AEs who would perform well. (Def.'s R. 56.1 Stmt. ¶¶ 53-54; Lopez Dep. at 54).

In September 2004, Catherine Murphy ("Murphy") became Trotman's immediate supervisor.  (Def.'s R. 56.1 Stmt. ¶ 65; Decl. of Catherine L. Murphy, dated May 17, 2007 ("Murphy Decl."), ¶ 3).  The next month, Trotman complained to Lopez and Murphy during a luncheon meeting that he had fewer accounts than other AEs. (Def.'s R. 56.1 Stmt. ¶¶ 66-67; Sack Decl. Ex. L ¶ 5).  In response, Trotman was assigned the Princeton Longevity account, which he concedes was a "lucrative" account.  (Def.'s R. 56.1 Stmt. ¶¶ 70-71; Sack Decl. Ex. M (letter from Trotman to the Equal Employment Opportunity Commission ("EEOC"), dated Oct. 10, 2005, at 3-4)).

In January or February 2005, Murphy warned Trotman that his sales performance still needed to be improved.  (Def.'s R. 56.1 Stmt. ¶ 73; Trotman Dep. at 231).  Trotman understood this to be an indication that his job was in jeopardy.  (Trotman Dep. at 231-33).  In fact, he believed as early as 2004 that his days at CBS Radio were numbered.  (Id. at 225).

On March 31, 2005, a representative of Princeton Longevity called CBS Radio regarding a "minor" scheduling error.  Murphy instructed Trotman not to respond to the complaint until she met with him.  (Trotman Dep. at 223-24, 247, 254).  By the time she made that request, however, Trotman had emailed and telephoned Princeton Longevity to resolve the error.  (Id. at 223).

Thereafter, Trotman waited at the CBS Radio office for some time to speak with Murphy.  (Id. at 247-48).  While he was waiting, he emailed her information regarding the scheduling error.  (Id.).  He then left the office "to take care of some pressing important business in Long Island."  (Id. at 247).  After he left, Murphy telephoned Trotman and complained that he had departed without notifying her.  (Id.).  She also told Trotman that Princeton Longevity did not have the information needed to resolve the scheduling error and accused Trotman of not responding to the complaint.  (Id.).  Trotman responded that all the information Princeton Longevity needed was in the email message he previously had sent to her.  (Id. at 248).

During their conversation, Murphy instructed Trotman to meet with her the next day at 8:30 a.m.  (Id. at 239, 248).  Unbeknownst to CBS Radio, however, by the

9

time the conversation ended, Trotman had decided not to return to CBS Radio.  (Id. at

255).  He claims that he reached this decision because he was "struggling with many

things in [his] life," including CBS Radio's failure to assign accounts to him.  (Trotman

Aff. ¶ 4).  After not seeing or hearing from Trotman for more than one week, CBS Radio

terminated his employment by letter dated April 8, 2005, citing as a basis his "recent

unauthorized leave of absence for the past seven days."  (Sack Decl. Ex. N; Def.'s R. 56.1

Stmt. ¶ 86).  In its letter, CBS Radio referred to its "final warning" in December 2003 that

he would be "terminated immediately" if he failed to "show up to work."  (Sack Decl. Ex.

N).

> 2.      Comparison of Trotman's Accounts
>         to Those of Other Account Executives

A CBS Radio AE typically services only one of two types of accounts:

"retail" (also known as "direct") or "agency."  (Def.'s R. 56.1 Stmt. ¶ 90; see Trotman

Dep. at 38).  An AE assigned to retail accounts deals directly with the entity that is buying

advertising time from CBS Radio.  (Def.'s R. 56.1 Stmt. ¶ 91; see Trotman Dep. at 38).

An AE assigned to agency accounts typically deals with an intermediary advertising

agency.  (Def.'s R. 56.1 Stmt. ¶ 92; see Trotman Dep. at 38).  Trotman was an AE

assigned to retail accounts.  (Def.'s R. 56.1 Stmt. ¶¶ 1, 3; see Trotman Dep. at 38).

An AE's compensation is based on the quantity of advertising time sold, not

the number of accounts serviced.  (Def.'s R. 56.1 Stmt. ¶ 89; Trotman Dep.

at 335).  AEs assigned to retail accounts earn a seventeen-percent commission if they

meet their monthly sales goals, and a fifteen-percent commission if they do not.  (Def.'s

R. 56.1 Stmt. ¶ 93; Trotman Dep. at 183-84).  AEs assigned to agency accounts earn a

five-percent commission if they meet their monthly sales goals, and a four-percent

commission if they do not.  (Def.'s R. 56.1 Stmt. ¶ 94; Trotman Dep. at 184).  Each AE's

compensation therefore depends on his or her sales performance.  (Def.'s R. 56.1 Stmt.

¶ 95; see Lopez Dep. at 22).

        a.     <u>Trotman</u>

        To induce Trotman to accept a position as an AE, CBS Radio offered him a

nominal salary of $16,000 to be supplemented by sales commissions.  CBS Radio also

undertook to "construct a client list for [him] that [would] generate approximately

$40,000" in commissions during his first year.  (Ostrove Decl. Ex. 2).  Despite that

commitment, Trotman does not recall receiving such a list.  (Trotman Dep.

at 33-35).

        In 1999, Trotman requested, and was assigned, an Orphaned Account

whose name he did not recall.  (Def.'s R. 56.1 Stmt. ¶ 110; Trotman Dep.

at 195-96).  On another occasion, one of Trotman's sales managers assigned him the "Ad

Lab" account.  (Def.'s R. 56.1 Stmt. ¶ 112; Trotman Dep. at 190).  In addition, as noted

above, Trotman was given the Princeton Longevity account in 2004.  (Def.'s R. 56.1

Stmt. ¶ 70; Sack Decl. Ex. M at 3-4).

11

The monthly "commission runs" submitted by CBS Radio in support of its motion for summary judgment show that Trotman earned the following commission income:  over $70,000 in 2001 (see Sack Decl. Ex. P); approximately $70,000 in 2002 (see id. Ex. Q); over $65,000 in 2003 (see id. Ex. R); and over $75,000 in 2004 (see id. Ex. S).

           b.     Scott Tacinelli

Scott Tacinelli ("Tacinelli"), a Caucasian AE, has a degree in marketing. Before joining CBS Radio, he was a supervisor for concession stands at the PNC Bank Arts Center.  (Tacinelli Dep. at 24).  Tacinelli began working at CBS Radio on September 19, 1999, as a sales assistant.  (Id. at 5).  Thereafter, CBS Radio promoted him to an AE position in November 2000.  (See id. at 6).  When Tacinelli began to work as an AE, CBS Radio guaranteed him an income of $2,000 per month for three months.  (Id.).  Pursuant to this guarantee, if his commission income for any month was less than $2,000, he was paid $2,000; if his monthly commissions exceeded $2,000, he earned only the commission income.  (Id. at 7).  After the three-month guarantee expired, Tacinelli's compensation was based solely on his commissions.  (See id. at 8).

CBS Radio did not assign Tacinelli any accounts when he started as an AE. (Id. at 19).  Nevertheless, during his first year as an AE, Tacinelli was able to secure through his own efforts "[b]etween one and ten" accounts.  (Id. at 41-43).  Thereafter, Tacinelli occasionally asked CBS Radio to assign him additional accounts.  (Def.'s

R. 56.1 Stmt. ¶ 111; Tacinelli Dep. at 17).  CBS Radio "sometimes" granted these

requests.  (Def.'s R. 56.1 Stmt. ¶ 111; Tacinelli Dep. at 17).

        In 2001, CBS Radio gave Tacinelli an oral warning because of his poor

sales performance.  (Tacinelli Dep. at 33-34).  The monthly commission runs show that

Tacinelli earned $28,062.92 in commissions that year.  (See Sack Decl. Ex. P).  His

performance subsequently improved, and he earned over $50,000 in 2002 (see id. Ex. Q);

almost $90,000 in 2003 (see id. Ex. R); and over $125,000 in 2004 (see id. Ex. S).

                c.      John Killeen

        John Killeen ("Killeen"), another Caucasian AE, had extensive advertising

sales experience before joining CBS Radio.  (See Killeen Dep. at 4, 16).  When Killeen

started working at CBS Radio in 2002, the station did not assign him any accounts, but

agreed to pay him a salary of $1,200 per month.  (Id. at 6, 8; Sack Decl. Ex. Q).  After

Killeen had been working at CBS Radio for about one year, CBS Radio began assigning

him accounts, although he still obtained a "majority" of his accounts through "cold

calling."  (Killeen Dep. at 9-10, 14).  Killeen has never had disciplinary problems at CBS

Radio.  (Id. at 24).

        The monthly commission runs show that Killeen earned the following

commissions:  approximately $10,000 in 2002 (see Sack Decl. Ex. Q); over $67,000 in

2003 (see id. Ex. R); and over $100,000 in 2004 (see id. Ex. S).

B.    <u>Procedural History</u>

Trotman filed a charge of discrimination with the EEOC on June 28, 2005. (Sack Decl. Ex. L).  In his charge, Trotman alleged that he was "discriminated against because of [his] race when [he] was denied existing active accounts, those which became available when [AEs] left [CBS Radio] or those accounts formerly known as 'house accounts.'"  (<u>Id.</u> ¶ 1).  He further alleged that "[a]ctive and favorable accounts were primarily given to two Caucasian gentlemen, John Killeen and Scott Tacinelli, who did not have comparable . . .  experience."  (<u>Id.</u> ¶ 3).  On January 20, 2006, the EEOC sent Trotman a right to sue letter which stated that there was "no evidence to show that [CBS Radio's] employment actions were based on [his] race."  (Compl. Attach.).

On April 14, 2006, Trotman submitted to the Pro Se Office of this Court a complaint which named as defendants Steve Swenson (CBS Radio's Vice President), Lopez, and "WCBS-AM d/b/a CBS Radio-Infinity Broadcasting, Inc."  (Docket No. 2). On October 12, 2006, I granted the individual defendants' motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure because, as Trotman conceded, neither of them was his "employer" under Title VII.  (Docket No. 11). Trotman has since requested that the caption be amended to name as the corporate defendant "CBS Radio Inc."  (Pl.'s Mem. at 1 n.1).  That application is granted without opposition.

On November 29, 2006, Leeds Morelli & Brown, P.C., appeared in this action on behalf of Trotman.  (Docket Nos. 17-18).  Thereafter, I extended the discovery deadline to permit Trotman's counsel to take depositions.  (<u>See</u> Docket No. 24).

Following the close of discovery, CBS Radio filed its motion for summary judgment on May 18, 2007.  (Docket Nos. 28-32).  Trotman filed his opposition papers on June 8, 2007.  (Docket Nos. 33-35).  CBS Radio filed its reply papers on June 21, 2007. (Docket Nos. 36-38).

III.    <u>Discussion</u>

A.    <u>Standard of Review</u>

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  In deciding a motion for summary judgment, the court must "view the evidence in the light most favorable to the party against whom summary judgment is sought and . . . draw all permissible inferences in favor of that party."  <u>Fischl v. Armitage</u>, 128 F.3d 50, 55 (2d Cir. 1997).  The Court also must accept as true the non-moving party's evidence, if supported by affidavits or other evidentiary material.  <u>See Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986).  Moreover, assessments of credibility,

choosing between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court.  Fischl, 128 F.3d at 55; see also Fed. R. Civ. P. 56(e) 1963 advisory committee note.  Thus, "[t]he court's function is not to resolve disputed issues of fact but only to determine whether there is a genuine issue of material fact to be tried."  Fischl, 128 F.3d at 55.

To defeat a motion for summary judgment, the non-moving party cannot merely rely upon the allegations contained in the pleadings that raise no more than "some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The non-moving party must offer "concrete evidence from which a reasonable juror could return a verdict in his favor."  Anderson, 477 U.S. at 256.  Moreover, the moving party is not required to disprove unsupported assertions made by the non-movant.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact."  Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998) (citing D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998)).

B.    Timeliness

CBS Radio argues that Trotman's allegations regarding discriminatory acts that occurred before September 1, 2004 – 300 days prior to when he filed his EEOC charge – are untimely under Title VII.  (See Def.'s Mem. at 15 n.21; Answer ¶ 19).  Title VII provides that an EEOC charge must be filed within 180 days after the alleged

16

discriminatory practice, unless the person aggrieved has instituted proceedings with a state or local agency, in which case the limitations period is extended to 300 days. 42 U.S.C. § 2000e-5(e)(1). In this case, Trotman's complaint indicates that he did not file a charge against CBS Radio with either the New York State Division of Human Rights or the New York City Commission on Human Rights. (Compl. ¶ 9). Trotman's limitations period is therefore 180 days, not 300 days, from the date he filed his EEOC charge. Because Trotman filed his EEOC charge on June 28, 2005, he can recover only for discriminatory acts which occurred on or after December 31, 2004.

CBS Radio argues that Trotman's complaint should be dismissed because Trotman can point to no discriminatory acts that occurred during the limitations period. (Def.'s Reply at 2-3). However, the burden is on CBS Radio to establish its affirmative defense that Trotman's claims are time barred. See Bertha Bldg. Corp. v. Nat'l Theatres Corp., 248 F.2d 833, 835 (2d Cir. 1957). In that regard, CBS Radio has proffered no evidence of when it decided to assign particular accounts to AEs other than Trotman. Therefore, in the absence of any evidence that CBS Radio's allegedly discriminatory decisions to assign accounts to AEs other than Trotman all occurred before December 31, 2004, CBS Radio has failed to establish that Trotman's claims are time barred.

C.   Disparate Pay Under Title VII

Title VII provides that an employer may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."

17

42 U.S.C. § 2000e-2(a)(1).  Under the familiar burden-shifting analysis applicable to Title VII claims, see McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973), a plaintiff seeking to recover damages for disparate pay must first establish a prima facie case by showing:  (1) that he was a member of a protected class; (2) that he was paid less than similarly-situated non-members of his protected class; and (3) evidence of discriminatory animus.  See, e.g., Belfi v. Prendergast, 191 F.3d 129, 139 (2d Cir. 1999); Thomas v. iStar Fin., Inc., 438 F. Supp. 2d 348, 367 (S.D.N.Y. 2006).  This burden has been described as "de minimis."  See Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 467 (2d Cir. 2001).

Once the plaintiff makes out a prima facie case, "a rebuttable presumption of discrimination arises and the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment decision."  Stratton v. Dep't for the Aging, 132 F.3d 869, 879 (2d Cir. 1997).  This step "force[s] the defendant to give an explanation for its conduct, in order to prevent employers from simply remaining silent while the plaintiff founders on the difficulty of proving discriminatory intent."  Fisher v. Vassar Coll., 114 F.3d 1332, 1335 (2d Cir. 1997) (en banc).

Finally, if the defendant provides a nondiscriminatory rationale for its conduct, the rebuttable presumption drops out of the case.  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993).  The burden then rests on the plaintiff to prove not only that the proffered nondiscriminatory reason was pretextual, but also that the

defendant discriminated against the plaintiff.  Slattery v. Swiss Reinsurance Am. Corp.,

248 F.3d 87, 91 (2d Cir. 2001).

      CBS Radio concedes that Trotman is an African-American who is a

member of a protected class and was paid less than Tacinelli and Killeen in 2003 and

2004.  (See Def.'s Mem. at 1, 11).  However, CBS Radio contends that Trotman cannot

make out the remaining elements of a prima facie case because he was not "similarly

situated" to Tacinelli or Killeen and can point to no evidence of discriminatory animus.

(Def.'s Mem. at 16-17).

      1.    Similarly Situated

      To prevail on a disparate pay claim under Title VII, "a plaintiff must

establish that the individuals with whom he attempts to compare himself are 'similarly

situated' in all material respects."  Simpson v. Metro-North Commuter R.R., No. 04 Civ.

2565 (PAC), 2006 WL 2056366, at *7 (S.D.N.Y. July 20, 2006) (citing DeJesus v. Starr

Technical Risks Agency, Inc., No. 03 Civ. 1298 (RJH), 2004 WL 2181403, at *9

(S.D.N.Y. Sept. 27, 2004)).  Among the factors to be considered in determining whether

employees are similarly situated are their "specific work duties, education, seniority, and

performance history."  Id.  For employees to be considered similarly situated, "their

circumstances need not be identical, but there should be a reasonably close resemblance

of facts and circumstances . . . . What is key is that they be similar in significant respects."

Lizardo v. Denny's, Inc., 270 F.3d 94, 101 (2d Cir. 2001) (citation omitted) (applying this

standard to a Section 1981 claim).

CBS Radio argues that Trotman's situation was not comparable to that of Tacinelli or Killeen because they did not share his history of absenteeism and inattentiveness to clients. (Def.'s Mem. at 16-17). However, Trotman, Tacinelli, and Killeen had the same job title, performed the same functions, and had similar years of experience at CBS Radio. Moreover, job performance is merely one of several nonexhaustive factors that a finder of fact must consider in determining whether an employee is similarly situated. See Simpson, 2006 WL 2056366, at *7. A reasonable juror therefore could find that Trotman, Tacinelli, and Killeen were similarly situated despite Trotman's checkered history at CBS Radio.

### 2.  Discriminatory Animus

To prevail on a disparate pay claim, a plaintiff also must show that "the employer's adverse employment decision occurred under circumstances that raise an inference of discrimination." Belfi, 191 F.3d at 140. The Second Circuit has cautioned that summary judgment often is inappropriate in cases where an employer's intent is at issue because direct evidence of intent is rarely available. See, e.g., Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994); Patrick v. LeFevre, 745 F.2d 153, 159 (2d Cir. 1984). However, when an employer has explained its conduct and the plaintiff has offered only conclusory assertions in opposition, summary judgment may be granted. See, e.g., Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985) ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations

of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases.").

Trotman argues that CBS Radio's discriminatory intent can be inferred from such actions as firing him without warning almost one and one-half years after he had "rehabilitate[d] himself." (See Pl.'s Mem. at 13-14). Assuming, arguendo, that this is a sufficient prima facie showing of discriminatory intent, CBS Radio has proffered a nondiscriminatory reason for its failure to pay Trotman more and to terminate him – namely, his lack of attention to his clients and unexplained absences. (Def.'s Mem. at 20). The burden thus shifts to Trotman, who must show that a juror could reasonably infer that CBS Radio's nondiscriminatory reasons are pretextual and that it acted with discriminatory animus.

Trotman advances three arguments in this regard. First, Trotman argues that CBS Radio's discriminatory animus can be inferred from the fact that its "hiring practices involved the hiring of significantly more white employees than African-American employees." (Pl.'s Mem. at 13, 17). In support of this allegation, Trotman has submitted his own affidavit, in which he attests that during his tenure, there were never more than ten African-Americans at CBS Radio despite a staff totaling approximately eighty to one hundred employees. (Trotman Aff. ¶ 3). He also notes that when he first joined CBS Radio, he was the only African-American on the sales team, and that the station's general manager has testified that only about twenty of CBS Radio's 120 employees and free-lancers were members of racial minorities. (Pl.'s Mem. at 6) (citing

Dep. of Kevin Smith, taken on Mar. 29, 2007 ("Smith Dep."), at 32-33; Swenson Dep. at 45-47). Trotman has not submitted any evidence, however, as to the numbers of African-Americans and members of other racial minorities who applied for jobs (particularly jobs as AEs) at CBS Radio. He therefore has not shown that CBS Radio rejected African-American or other minority applicants more frequently than other applicants. Indeed, he himself was hired after three white employees interviewed him.

Perhaps more importantly, Trotman's Title VII claim alleges discriminatory pay disparity, not discriminatory hiring. Thus, even if Trotman had submitted sufficient evidence of discriminatory hiring – which he has not – this would be irrelevant to his claim of disparate pay because CBS Radio's commission rates and assignment of accounts to AEs have not been shown to be related in any way to its hiring practices. See Joseph v. Leavitt, 465 F.3d 87, 93 (2d Cir. 2006) (plaintiff failed to establish Title VII case because he had not "pointed to any evidence of discriminatory animus directed personally at him").

Trotman argues further that pretext and discriminatory animus may be inferred because, "[w]hen African-American [AEs] were hired by [CBS Radio], they were not provided with as many accounts as white [AEs], causing the white [AEs] to be paid more." (Pl.'s Mem. at 13, 17-18). However, the evidence does not support this conclusory assertion. It appears that only four AEs were deposed during pretrial discovery. Trotman testified that he had been promised a list of accounts when he was hired, but no such list ever was given to him. (Trotman Dep. at 33-35). Surprisingly,

Kevin Smith ("Smith"), another African-American AE, was not asked during his deposition whether he was assigned any accounts when he was hired by CBS Radio. Tacinelli, a white AE, testified that when he became an AE, CBS Radio did not assign him any accounts.  (Tacinelli Dep. at 41-43).[5]  Killeen, another white AE, also testified that he did not receive any accounts when he started working at CBS Radio.  (Killeen Dep. at 4, 8-9).  Thus, even if Smith was not given any accounts when CBS Radio hired him, the evidence still would establish that the African-American AEs were treated no differently than white AEs.  In the absence of any other admissible evidence regarding the assignment of accounts to newly-hired AEs, no reasonable juror could infer a discriminatory animus solely from the fact that Trotman was not given any accounts when he was hired by CBS Radio.[6]

Finally, Trotman argues that CBS Radio's discriminatory animus can be inferred from the circumstances surrounding his termination.  (Pl.'s Mem. at 13, 17-18). According to Trotman, "after he was given a chance to rehabilitate himself during the course of three warning memorandums regarding attendance, he did rehabilitate himself

---

[5]     In his memorandum of law, Trotman suggests that CBS Radio's discriminatory animus is established by the fact that "Scott Tacinelli, who is white, . . . acknowledged that he had one to ten accounts on his client list in the first six months of his employment as an [AE] at CBS Radio."  (Pl.'s Mem. at 2) (citing Tacinelli Dep. at 24-25, 45).  However, Tacinelli testified that he brought all of those accounts "in the door" by himself.  (Tacinelli Dep. at 43).

[6]     It bears mention that Smith was hired in May 2005, one month <u>after</u> Trotman's termination.  (Smith Dep. at 32-33).  Smith testified that CBS Radio assigned approximately five accounts to him the very next year.  (<u>Id.</u> at 28-29).  Bill McGee, another African-American AE, was assigned JL Media, CBS Radio's largest account, as well as Furman Roth, another large account.  (Def.'s R. 56.1 Stmt. ¶ 115).

for almost a year and a half, and then he was suddenly terminated without any further warnings or additional chances." (Id. at 13).  However, in neither his complaint nor his EEOC charge does Trotman allege that his termination violated Title VII.  Indeed, Trotman could not make out such a claim because Pearson's December 2003 memorandum stated in no uncertain terms:  "This letter serves as a final warning.  If you do not show up to work or call in late with a legitimate excuse that cannot be verified, your employment with [CBS Radio] will be terminated immediately."  (Sack Decl. Ex. J) (emphasis added).  Having received this memorandum, Trotman cannot seriously complain that CBS Radio failed to give him "any further warnings or additional chances." In any event, when Trotman disappeared in early April 2005, Murphy tried to reach him by telephone over the course of six days.  (See Trotman Dep. at 245).  Trotman did not respond to these messages, however, because he had decided to leave CBS Radio and "didn't think [Murphy] deserved to know."  (Id. at 255).  In light of this conduct and Trotman's well-documented history of absenteeism, no reasonable juror could infer a discriminatory animus or pretext from the fact that CBS Radio terminated him after he once again failed to report to work without notice or an explanation.

Ironically, none of Trotman's three assertions regarding CBS Radio's alleged discriminatory animus relates directly to his claim that CBS Radio assigned Orphaned Accounts to Tacinelli and Killeen, rather than him, thereby causing him to earn lower commissions.  Although Trotman speculates that these Orphaned Accounts were withheld from him on the basis of race, the only evidence concerning that subject is the

deposition testimony of Lopez.  Lopez testified that his criteria for assigning accounts included an AE's sales performance, reliability, trustworthiness, and dependability.  (See Lopez Dep. at 75).  He further testified that race was "absolutely" not a factor in the assignment of accounts.  (Id. at 76).

Tellingly, during his deposition, Lopez was never asked why he assigned particular accounts to Tacinelli or Killeen instead of Trotman.  Moreover, Trotman has admitted that CBS Radio assigned him no fewer than three accounts, including the Princeton Longevity account, which Trotman concedes was "lucrative."  (Trotman Dep. at 190, 195-96; Sack Decl. Ex. M at 3).[7]  Trotman also does not dispute that each AE's commission was based on the same racially-neutral computational formula.  Thus, the evidence shows that Trotman's lower pay did not result from CBS Radio's alleged discriminatory animus, but, rather, his own failure to generate more sales.

In sum, because no reasonable juror could find that CBS Radio's racially-neutral reasons for assigning accounts to AEs other than Trotman were pretextual, or that CBS Radio made such decisions with discriminatory animus, CBS Radio is entitled to summary judgment.

---

[7]       In his memorandum of law, Trotman alleges that "Princeton Longevity was the only account that [CBS Radio] gave Trotman."  (Pl.'s Mem. at 2) (emphasis in original).  This assertion is belied by his own deposition testimony that CBS Radio had assigned him two other accounts.  (Trotman Dep. at 190, 195-96).

IV.    Conclusion

The caption of this action is amended to name CBS Radio Inc. as the sole

defendant. Additionally, for the reasons set forth above, CBS Radio's motion for

summary judgment (Docket No. 28) is granted, and Trotman's complaint is dismissed

with prejudice.

In light of this disposition, the Clerk of the Court is respectfully requested

to close this case.

SO ORDERED

Dated:        New York, New York
              September 27, 2007


                                        FRANK MAAS
                                        United States Magistrate Judge




Copies to:

Rick Ostrove, Esq.
Leeds Morelli & Brown, P.C.
Fax: (516) 747-5024

Laura Sack, Esq.
Kauf McClain & McGuire LLP
Fax: (212) 644-1936